# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 20- |
| v. | : | DATE FILED: _____ |
| RICARDO RICHARDSON | : | VIOLATIONS |
| JOHN SCOTT WATKINS | | 18 U.S.C. § 1343 (wire fraud – 1 count) |
| GARY WOLFF | : | 18 U.S.C. § 371 (conspiracy – 1 count) |
| EDWARD HEIL | | 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. |
| | : | § 240.10b-5 (securities fraud – 2 counts) |
| | | 18 U.S.C. § 2 (aiding and abetting) |

## INDICTMENT

## COUNT ONE

**THE GRAND JURY CHARGES THAT:**

### BACKGROUND

At various times material to this indictment:

1.      AI Document Services, Inc. ("AIDC") was a Delaware corporation with its principal place of business in Atlanta, Georgia.  According to its public filings, for a brief period of time in 2014, the company was in the nutraceutical products business.  On August 31, 2015, the company merged with Diaspora Foods International, LLC and Asante Restaurant LLC. AIDC's securities were quoted on OTC Link (formerly referred to as the "Pink Sheets"), operated by OTC Markets Group, Inc. ("OTC Link"), under the symbol "AIDC."  AIDC was an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78l.

2.      Creative Edge Nutrition, Inc. ("FITX") was a Nevada corporation headquartered in Beverly Hills, California.  According to its public filings, until November 30,

2015, it had a wholly owned subsidiary, Cen Biotech, Inc., which had been established in 2013 "for the sole purpose of applying to obtain a license to produce and supply medical marihuana" in Canada. After the spinoff of CEN Biotech, FITX was said to be "focused on developing innovative, high quality supplements," including an energy drink. FITX's securities were quoted on OTC Link under the symbol "FITX."

3.    Interactive Health Network ("IGRW") was a Nevada corporation headquartered in Reno, Nevada. According to public filings and press releases, the company "manufactures, markets and sells high quality lifestyle products and nutraceuticals" and had a wholly owned subsidiary, Cannabis Health Group. In May 2015, the company announced three new divisions in the cannabis industry. IGRW's securities were quoted on OTC Link under the symbol "IGRW."

4.    The companies traded on OTC Link tended to be extremely small, and the stock in those companies tended to be closely held (that is, owned by a small number of individuals) and thinly traded (that is, traded far less frequently than stocks in larger companies on larger exchanges).

5.    Defendant RICARDO RICHARDSON was a businessman based in Georgia who owned and controlled a substantial number of shares of AIDC, FITX, and IGRW stock.

6.    Defendant JOHN SCOTT WATKINS was a resident of Georgia who owned and controlled a substantial number of shares of AIDC, FITX, and IGRW stock.

7.    Defendant GARY WOLFF was an attorney in New York who owned and controlled a substantial number of shares of AIDC, FITX, and IGRW stock.

2

8.      Defendant EDWARD HEIL was a resident of Texas and an accountant who owned and controlled a substantial number of shares of AIDC, FITX, and IGRW stock.

9.      Joel Stohlman, charged elsewhere, was a businessman based in Georgia who owned and controlled a substantial number of shares of AIDC, FITX and IGRW stock.

10.     Person No. 1 was a businessman based in Georgia who owned and controlled a substantial number of shares of AIDC, FITX, and IGRW stock.

11.     An individual known to the grand jury and identified here as the cooperating witness (the "CW") was secretly cooperating with the government. In this capacity, the CW posed as an individual who could facilitate the manipulation of the price and trading volume of publicly traded shares for a fee.

12.     Undercover Agent-1 ("UC-1") was a Special Agent with the Federal Bureau of Investigation (the "FBI"). In this capacity, UC-1 posed as a family friend of the CW and also as the girlfriend of Undercover Agent-2.

13.     Undercover Agent-2 ("UC-2") was a Special Agent with the FBI who posed as a stock promoter, and also as the boyfriend of UC-1. In this capacity, UC-2 posed as an individual who could facilitate the manipulation of the price and trading volume of publicly traded shares for a fee.

14.     The United States Securities and Exchange Commission (the "SEC") was an independent agency of the United States government, which was charged by law with protecting investors by regulating and monitoring, among other things, the purchase and sale of publicly traded securities, including securities such as AIDC, FITX, and IGRW stock that were traded on OTC Link. Federal securities laws prohibited fraud in connection with the purchase and sale of securities, including the manipulation of the price and trading volume of stock sales

through (i) the hidden coordination of company press releases with the distribution of misleading email newsletters and (ii) the use of secret payments to brokers.

15.     From in or about Spring 2014 through in or about Spring 2016, in the Eastern District of Pennsylvania, and elsewhere, defendants

**RICARDO RICHARDSON,
JOHN SCOTT WATKINS,
GARY WOLFF, and
EDWARD HEIL**

devised and intended to devise a scheme to defraud shareholders of public companies AIDC, FITX, and IGRW, and to obtain money and property by means of knowingly false and fraudulent pretenses, representations, and promises.

### MANNER AND MEANS

It was part of the scheme that:

16.     Defendants RICARDO RICHARDSON, JOHN SCOTT WATKINS, GARY WOLFF, and EDWARD HEIL, and their co-schemers Joel Stohlman, Person No. 1, and other persons known to the grand jury, sought to generate illegal proceeds by causing manipulative market activity in AIDC, FITX, and IGRW stock that was designed to falsely make it appear that trading in those stocks was the result of free and fair market forces, and by preventing the SEC from detecting the scheme or taking regulatory action against them to halt the scheme. They did this in various ways, including the following:

a.     Obtaining control of virtually all of the free trading shares in AIDC, and the majority of the free trading shares that were not subject to additional restrictions in FITX and IGRW, so that they could control the timing, price, and volume of shares available for trading. By having control of this stock, scheme participants made it more likely that they would receive maximum profit because most of the stock available for sale during the

manipulation would be stock that was under the participants' control. Having control of this stock would also make it less likely that the stock manipulation would draw the attention of the SEC, as the participants could control the promotion of the stock over a longer period of time, thereby avoiding a suspicious rapid rise and fall of the price and trading volume of the stock.

b.      Disguising their ownership of the shares, as well as the proceeds that they planned to receive in the scheme, by (i) using nominees and nominee corporations, (ii) establishing International Business Companies ("IBC") with nominee owners and officers, and (iii) planning to use foreign financial accounts, to make it more difficult for the SEC to detect the scheme and trace the proceeds received by the schemers. This activity also made it less likely that the SEC would learn that individual participants in the scheme owned more than 5% of the stock. Under SEC rules, when a shareholder or a group of shareholders had beneficial ownership of more than 5% of stock in a company, the shareholder or group was required to file a Schedule 13D or a Schedule 13G reporting various facts about the ownership.

c.      Establishing a company, FDQ, Inc., and employing a nominee officer for FDQ in order to pool shares of their stock. By pooling their shares, the schemers could control the amount of shares that were for sale in the market at any one time and prevent their fellow schemers from selling too rapidly, as sales of a large amount of stock in a short period of time could cause the price of the stock to fall quickly.

d.      Agreeing to transfer the schemers' shares to FDQ gradually to conceal that FDQ, and the schemers' group collectively, had beneficial ownership of more than 5% of a public company's stock.

e.      Establishing a brokerage account for FDQ at a brokerage firm based in the United States and agreeing that the schemers would also have their own brokerage

accounts at this brokerage firm. The schemers chose this brokerage firm knowing that two employees of the brokerage firm had agreed to violate SEC rules by selling the shares in the manipulated stocks and then allocating the proceeds equally among the scheme participants, rather than treating FDQ and the schemers as separate market participants whose shares should be handled independently.

    f.  Having company officers in place at AIDC, FITX, and IGRW who would act at the direction of the scheme participants rather than exercising their independent judgment.

    g.  Agreeing to provide shareholder lists and other documents that were not available to the general public, as well as the passwords to their brokerage accounts, to UC-2 in order to be "transparent," thereby avoiding the risk that a scheme participant could cheat other participants by not adhering to the agreed upon schedules for the sale of the stocks.

    h.  Using debt conversion in order to obtain free trading shares of AIDC, FITX, and IGRW so that the stock could be sold during the scheme. Debt conversion was obtained by providing false and misleading opinion letters to stock transfer agents and brokers.

    i.  Agreeing to pay a kickback fee of 40% of the proceeds of their stock sales for prearranged purchases of the schemers' stock in AIDC, FITX, and IGRW. The schemers understood that 30% of these proceeds would be paid to corrupt stockbrokers who would purchase this stock in the discretionary accounts of their customers and that 10% of these proceeds would be UC-2's fees for arranging these fraudulent purchases. The schemers also understood that the brokers would hold the stock in their clients' accounts for a lengthy period of time after purchasing the stock, generally at inflated prices. Having brokers who were willing to

buy stock at agreed upon times and, when possible, at agreed upon prices, and who were also willing to hold this stock was valuable to the schemers because it guaranteed them stock sale proceeds in illiquid securities, increased the likelihood that their stock manipulation would be profitable, and decreased the likelihood that there would be a sudden drop in the price of the stocks that would generate an investigation by the SEC.

        j.     Agreeing to coordinate the manipulative trading activity described above with issuance of company press releases to provide a false pretext for the increased trading volume and increased price of the stocks that they would be manipulating.

        k.     Agreeing to hire a stock promoter to distribute numerous email newsletters (i.e., "email blasts") to potential stock purchasers in coordination with the issuance of press releases before the corrupt brokers caused their discretionary clients to buy the stock. The coordination of press releases and email blasts served multiple purposes, including: (i) creating the false impression to investors that there was market interest in AIDC, FITX, and IGRW stock, when in fact there was little or no interest in these stocks; (ii) increasing the share price of AIDC, FITX, and IGRW stock before the corrupt brokers bought the stock so that the price would be higher when they did so; and (iii) limiting scrutiny by the SEC by making it appear that increases in the volume of trading of these stocks was justified by the press and investor interest that the company generated. The planned press releases and email blasts would be misleading because they would not disclose various material facts, including the fact that the co-schemers: (i) collectively controlled the vast majority of AIDC, FITX, and IGRW stock available for trading, (ii) were coordinating these public companies' press releases with email blasts and prearranged stock transactions, or (iii) were paying kickbacks to brokers to purchase their stock in their customers' discretionary accounts.

l.      Agreeing to take additional steps to avoid SEC scrutiny, including the following: (i) having the proceeds of stock sales paid to nominees in order to disguise the ownership of the shares; (2) limiting what they discussed via email, and also being discreet when speaking on recorded telephone lines with stock brokers, in order to avoid creating a record of their manipulative activity; and (3) creating false contracts and invoices to disguise payments made to participants in the scheme and individuals assisting them in order to create the false appearance that those payments were for legitimate services to AIDC, FITX, IGRW, and other unrelated companies, when in reality the payments were for assistance in manipulation of the stock or as a means of distributing proceeds of the scheme to participants.

m.      Using the wires and facilities of interstate and foreign commerce to carry out their scheme.

## I.    **Preparation in Mid-2014**

17.    In or about Spring and Summer 2014, defendants RICARDO RICHARDSON, JOHN SCOTT WATKINS, EDWARD HEIL, and GARY WOLFF, as well as Joel Stohlman, Person No. 1, and the CW, took preliminary steps in the future manipulation of the stocks of AIDC, FITX, and IGRW.  The CW had participated in prior manipulations of FITX and IGRW stocks with defendants RICHARDSON, WATKINS, and WOLFF, as well as with Stohlman and others, during which the participants had used convertible debt to obtain free trading shares, set up offshore brokerage accounts, caused email blasts to be widely distributed to potential investors in coordination with press releases, and sold their stock at a profit.  The defendants, Stohlman, and the CW also discussed the manipulation of AIDC, a new company in which the CW had invested $9,000 in exchange for 6 million shares of stock, despite not knowing what company would be merged into AIDC.

18.     In or about April and May 2014, defendant RICARDO RICHARDSON, Joel Stohlman, Person No. 1, and the CW communicated by email regarding HPC POS System, Corp., the predecessor company to IGRW.

19.     On or about June 23, 2014, defendant RICARDO RICHARDSON emailed the CW, copying Joel Stohlman, and invited the CW to join defendant RICHARDSON, Stohlman, Person No. 1, and another individual to meet the sellers of property in the Bahamas that the co-schemers were considering purchasing and merging into AIDC in order to further their planned manipulation of AIDC.  Defendant RICHARDSON also informed the CW that defendant RICHARDSON had high-level political contacts in the Bahamas.

20.     On or about July 2, 2014, defendant EDWARD HEIL sent an email to defendant RICARDO RICHARDSON and Joel Stohlman, copying defendant GARY WOLFF, concerning a Bahamian real estate business, which they were planning at the time to merge into AIDC, and attaching multiple documents pertaining to the potential change of ownership.  That same day, Stohlman forwarded defendant HEIL's email and attachments to defendant JOHN SCOTT WATKINS and Person No. 1.

21.     On or about July 11, 2014, during a recorded call, the CW spoke with defendant RICARDO RICHARDSON, Joel Stohlman, and Bahamian Attorney A.  Defendant RICHARDSON and Stohlman told the CW that Bahamian Attorney A could assist the CW in establishing offshore entities and brokerage accounts so the CW could deposit the CW's shares.

22.     In a separate conversation that day, Stohlman told the CW that establishing each entity would cost $2,500, and the CW would need multiple accounts to avoid the "4.9% rule," referencing the SEC rule that required individuals or entities that owned more than 5% of the stock of a public company registered under Section 12(g) of the Exchange Act to

file a form (Schedule 13D or Schedule 13G) reporting their ownership of this stock. Stohlman also stated that he would be meeting with defendant EDWARD HEIL, the schemers' accountant, and they would need the names of the CW's offshore entities.

23.     On or about July 14, 2014, defendant RICARDO RICHARDSON, acting on behalf of the CW, emailed Bahamian Attorney A, copying Joel Stohlman. In the email, defendant RICHARDSON inquired about the cost for two or three IBCs in the Bahamas, and noted that after the entities were formed, they would like to open bank accounts and/or brokerage accounts.

24.     On or about July 15, 2014, during a recorded call, Joel Stohlman told the CW that he had met with defendant EDWARD HEIL and others regarding the AIDC transaction and expressed optimism about the deal.

25.     On or about July 16, 2014, Joel Stohlman emailed defendants RICARDO RICHARDSON, JOHN SCOTT WATKINS, GARY WOLFF, and EDWARD HEIL, Person No. 1, another individual, and the CW, instructing them to open a brokerage account at Interactive Brokers LLC.

26.     From in or about July 2014 through in or about October 2014, defendant RICARDO RICHARDSON and Joel Stohlman helped the CW to set up offshore entities to hold the AIDC stock that the CW would sell during the planned manipulation of AIDC. After Stohlman instructed the CW to put one of these entities in the name of a nominee to conceal that the CW controlled both accounts and owned more than 4.9% of AIDC's stock, the CW told Stohlman that one of the CW's spouse's friends, referring to UC-1, would sign the documents for his two offshore entities, Cap One LLC and Cap Two LLC.

27.     On or about August 1, 2014, during a recorded call, the CW spoke with

10

defendant GARY WOLFF, who requested the two non-affiliate letters that he thought Joel

Stohlman may have sent to the CW. Defendant WOLFF was referring to letters that would

falsely represent the amount of AIDC stock that the CW owned, and would also not disclose that

the CW was using nominees in order to disguise the full amount of the CW's AIDC share

ownership. Defendant WOLFF needed the letters containing this false and misleading

information in order to obtain a legal opinion that the CW's shares should be classified as free

trading.

      28.    On or about August 18, 2014, defendant JOHN SCOTT WATKINS sent

an email to Joel Stohlman, attaching an unsigned copy of a consulting agreement between

defendant WATKINS's entity JW Financial LLC and HPC POS System, Corp. (the former name

of IGRW), asking Stohlman to send him a signed copy. The document was dated a year

earlier—August 12, 2013. This draft contract stated that JW Financial would provide expertise

in "capital raising, shareholder communications and public relations" to HPC POS System. The

draft agreement also stated that "[t]he parties agree that the services to be provided by JW

Financial shall not be for the purpose of affecting the price of any security or influencing market

making activities in any security." Among other things, the draft agreement provided that upon

execution of the agreement, JW Financial would receive 35 million restricted shares of the

company, plus a monthly fee that could be converted to issued shares in the event that HPC POS

System could not pay the fees.

      29.    On or about September 10, 2014, in order to further prepare for the

manipulation of AIDC stock, Joel Stohlman sent an email to defendants RICARDO

RICHARDSON and JOHN SCOTT WATKINS, Person No. 1, and others, asking them to send

their AIDC stock certificates to defendant GARY WOLFF, who would hold the certificates until

AIDC's regulatory filings were complete and the certificates could be transferred. Stohlman also told the email recipients to be prepared to open an account at Folio Investments when Stohlman told them to do so.

30.    On or about September 12, 2014, defendant JOHN SCOTT WATKINS sent Joel Stohlman an email with the subject line "Stock Purchase Agg JWF - FITX $95k." This email attached a draft agreement between JW Financial LLC (defendant WATKINS's entity) and FITX to purchase FITX stock at a 50% discount, a sale of 2,835,820 shares for $95,000.

31.    On or about October 3, 2014, defendant JOHN SCOTT WATKINS sent defendant RICARDO RICHARDSON an email detailing requests from an attorney for documents that were needed for an opinion letter that the attorney was preparing in order to enable defendant RICHARDSON to obtain stock in HPC POS System, Corp., the previous company name of IGRW.

32.    On or about October 7, 2014, in response to defendant JOHN SCOTT WATKINS's email, defendant RICARDO RICHARDSON sent defendant WATKINS an email, copying Joel Stohlman, attaching a consulting agreement from 2011 between HPC POS System, Corp. and defendant RICHARDSON's consulting company.

33.    In or about October 2014, UC-1, who was acting as a friend of the CW's spouse, had multiple recorded conversations with Joel Stohlman, who was assisting her in setting up brokerage accounts as the CW's nominee. During one of those calls, after UC-1 told Stohlman that UC-1's boyfriend (referring to UC-2) was a stock promoter, Stohlman invited UC-1 to bring him to Atlanta for an event at a restaurant in which defendant RICARDO RICHARDSON had an interest, as several of Stohlman's close associates would be attending. On a recorded call on or about October 31, 2014, UC-1 accepted Stohlman's invitation.

II.   **Meetings in Atlanta in November 2014**

34.    On or about November 7, 2014, UC-1 and UC-2, who was acting as UC-1's boyfriend, met Joel Stohlman at an event at a restaurant in Atlanta, Georgia. During the recorded meeting, defendant RICARDO RICHARDSON, who was one of the owners of the restaurant, was present. Stohlman told UC-2 that Stohlman worked with a group of seven individuals on stock deals. During the event, UC-2 also met an individual who had experience with Bahamian businesses (the "Bahamas Nominee"), whom Stohlman confirmed was the "nominee" for the Bahamian entities that were being used by the CW. Later, defendant JOHN SCOTT WATKINS told UC-2 that defendant WATKINS, defendant RICHARDSON, Stohlman, and the Bahamas Nominee had been doing business for a long time and shared a high level of trust. Defendant WATKINS also stated that he was not sure whether he would be joining a meeting with UC-2 the next day, and that defendant WATKINS wanted to speak with UC-2 but did not want to talk to UC-2 on the telephone.

35.    On or about November 8, 2014, in a private room at the same Atlanta restaurant, UC-2 met with Joel Stohlman and defendants JOHN SCOTT WATKINS and RICARDO RICHARDSON. At the outset, defendant WATKINS stated that the individuals on his side of the deal came from different backgrounds. He explained that Stohlman runs "the back of the house," defendant RICHARDSON does a lot of the negotiating, and he (defendant WATKINS) is on the stock side. Defendant WATKINS stated that when his group gets involved in a deal, they control all of the stock in the deal. He identified his group as primarily himself, Stohlman, and defendant RICHARDSON. Defendant WATKINS then explained that his group was no longer planning on merging AIDC with a business involving Bahamian real estate, but instead were now planning to merge it with a television broadcasting business.

13

36.     As the meeting continued, Joel Stohlman described the status of the AIDC deal, explaining that: (i) there were seven individuals on their side of the deal, including himself, defendants RICARDO RICHARDSON and JOHN SCOTT WATKINS, and Person No. 1; (ii) the seven people in their group worked with defendants GARY WOLFF and EDWARD HEIL; (iii) there were 86 million outstanding shares of AIDC, with 44 million shares in the float (i.e., the free trading shares);   (iv) collectively, his group, together with defendants WOLFF and HEIL, controlled the entire float; and (v) any deposited free trading shares were held in an account that had less than 5% of the free trading shares.  Stohlman stated that in addition to the approximately 2 million AIDC shares that the CW owned, the CW had access to 3.4 million more shares through debt conversion.

37.     During the meeting, defendant JOHN SCOTT WATKINS then added that their group frequently obtained their stock through consulting agreements and debt conversion. As an example, he explained that (i) he had a consulting agreement with one of the public companies over multiple years, (ii) he received his "consulting" payments in convertible debt, which he converted into stock, (iii) when he sold this stock, he invested half of the proceeds into the company to obtain restricted shares, which could be converted into free trading shares in the future.

38.     As the meeting continued, defendant JOHN SCOTT WATKINS and Joel Stohlman discussed Creative Edge Nutrition, ticker FITX, mentioning the CEO and that the product that would be the focus of the company was an energy drink.  Defendant WATKINS explained that they had a large amount of convertible FITX debt so when they converted it into FITX shares, he and Stohlman would "own the whole thing."  Stohlman and defendant WATKINS then added that, with respect to IGRW, its float was 1.3 billion shares, the group

owned almost all of them, and the same people involved in AIDC were involved in IGRW. Stohlman and defendant WATKINS also explained how they had exercised control over IGRW in the past, caused its prior CEO to be fired, and selected its new CEO.

39.     During the meeting, defendant JOHN SCOTT WATKINS described his background, stating that he operated a brokerage firm and a clearing firm in the 1990s. He then explained the roles of Stohlman, himself, and defendant RICARDO RICHARDSON in the deals as follows: (i) Stohlman is good with organizing paperwork and has connections in the music and sport arenas; (ii) defendant WATKINS has a strong background in the stock market and has connections in the financial and legal arenas; and (iii) defendant RICHARDSON has his own connections.

40.     As the meeting continued, Joel Stohlman asked about UC-2's services and compensation. UC-2 explained that he could help the group get liquidity in the stock, that is, increase the volume of shares traded so that they could sell their shares. He added that for compensation, he could either take cash after the fact or stock upfront. Defendant JOHN SCOTT WATKINS said that (i) they were an "open book," and they would provide UC-2 with passwords for all of their brokerage accounts; (ii) their group could get as many shares as they wanted; and (iii) they knew brokers who could bring in market makers.

41.     During the meeting, UC-2 asked what the group was looking to get out of FITX. Defendant JOHN SCOTT WATKINS explained that they wanted to generate $3 million to $5 million, adding that maybe the stock would increase to $.05 to $.07 per share, after which point the stock price would drop. Defendant WATKINS said that the group wanted to work with the stock over one to two years because, according to defendant WATKINS, shareholders would not get hurt, the stock would sustain itself, and the group would make their money. Defendant

15

WATKINS noted that he did not want to upset the shareholders and bring attention to the project, and agreed with UC-2 that he did not want the attention of the SEC.

42.     UC-2 then explained his services to Joel Stohlman and defendants RICARDO RICHARDSON and JOHN SCOTT WATKINS, stating that he had brokers who would buy a large quantity of stock on behalf of their clients, and agree to hold the stock for a long period of time.  UC-2 said that he wanted DTCs, as he needed to keep track of the stock that was trading.  DTCs are shareholder lists maintained by the Depository Trust Company that are not available to the public.  These lists contain the names of the brokerage firms that are holding company stock on behalf of the firms' customers (the actual owners of the stock) and the number of shares each broker holds.

43.     Defendant JOHN SCOTT WATKINS responded that they could get DTCs to UC-2 six days per week because the DTCs were critical to understanding how the stock was trading and who owned the company's stock.  Defendant WATKINS also instructed Stohlman to give UC-2 the passwords for the DTCs so that he could access them himself.

44.     As the meeting continued, defendant JOHN SCOTT WATKINS, Joel Stohlman, and UC-2 discussed brokers.  Defendant WATKINS said that it was not advisable to put all of the group's shares in one brokerage firm.  He also mentioned that there could be problems with brokerage firms in the Bahamas.  Defendant RICARDO RICHARDSON then said that he agreed that Bahamian accounts could have problems unless one knew the right people, but defendant RICHARDSON said that they did know people in the Bahamas who could be helpful.

45.     Discussion at the meeting returned to IGRW.  Defendant RICARDO RICHARDSON and Joel Stohlman said that they had debt that could be converted at a discount.

Joel Stohlman told UC-2 that they could buy debt in IGRW and get an opinion letter from someone whom he confirmed was a "friendly attorney." Such opinion letters are needed by transfer agents to deem shares available to trade, i.e., free trading. Defendant JOHN SCOTT WATKINS then explained that on their side, the same people were involved in each deal. He stated that the hardest part of the deal was investor relations, they were looking to partner with someone like the CW, and they hoped that they could have a similar relationship with UC-2 to the one they had with the CW.

46.     During this discussion, UC-2 was shown shareholder lists for AIDC, FITX, and IGRW. The shareholder list for IGRW showed that, collectively, defendants RICARDO RICHARDSON and JOHN SCOTT WATKINS, together with Joel Stohlman, the CW, and Person No. 1, controlled approximately 1.3 billion IGRW shares.

47.     As the discussion continued, UC-2 stated that he wanted to know how much they wanted to liquidate on each deal. Defendant JOHN SCOTT WATKINS expressed his concern that if the group provided UC-2 with shares in the companies as compensation, and UC-2 distributed them to his people, these individuals would sell the stock and undercut the group's efforts. In response, UC-2 assured defendant WATKINS that they would coordinate the stock price and trading volume. Defendant WATKINS stated that he was stepping out of the meeting temporarily. Soon after, Joel Stohlman said that the group wanted to liquidate $10 million worth of IGRW shares. Stohlman noted that he was the CEO of FITX's predecessor company, and the current CEO of FITX does anything Stohlman wants.

48.     The meeting resumed later in the evening. During this discussion, defendant JOHN SCOTT WATKINS, Joel Stohlman, and UC-2 talked about how to set up and use offshore nominee entities and accounts. In response to UC-2's question regarding whether it

17

was okay to talk on the phone with people in the group, defendant WATKINS explained that it was okay to talk about actual business operations on the phone, but it was not okay to discuss the logistics of deals and marketing. As an example of topics that should not be discussed on the phone, defendant WATKINS referred to the issues that they had just discussed in their meeting. As the meeting was ending, defendant RICARDO RICHARDSON re-joined them and noted that they would work out the structure and execution of the deals. Defendant RICHARDSON indicated that he was willing to help UC-2 set up several offshore nominee entities.

### III.    Continued Preparation in late 2014 and Early 2015

49.    On or about December 3, 2014, defendant JOHN SCOTT WATKINS sent Joel Stohlman an email captioned "JWF [his entity JW Financial]- FITX 2014," attaching five documents. The body of the email said "$925,200." The attachments were five unsigned stock purchase agreements between FITX and defendant WATKINS's entity, JW Financial. They purported to provide for the purchase of the following number of FITX shares by JW Financial for the following prices on the following dates:

| Date | Price | Shares |
|------|-------|--------|
| 3/19/13 | $9,200 | 3,000,000 |
| 1/16/14 | $131,000 | 13,435,897 |
| 2/10/14 | $190,000 | 3,558,052 |
| 2/14/14 | $500,000 | 11,494,252 |
| 9/12/14 | $95,000 | 2,835,820 |
| **Total** | $925,200 | 34,324,021 |

50.    In or about January 2015, UC-2 exchanged multiple emails with defendants RICARDO RICHARDSON and JOHN SCOTT WATKINS, Joel Stohlman, and Bahamian Attorney A. On or about January 7, 2015, Bahamian Attorney A emailed UC-2, copying defendant RICHARDSON, notifying UC-2 that Bahamian Attorney A had established the five IBCs at price of $3,000 per entity. Two days later, on January 9, 2015, Bahamian

Attorney A emailed UC-2 and defendant RICHARDSON, enclosing copies of the certificates of incorporation of UC-2's five IBCs. On January 13, 2015, UC-2 sent an email to defendants RICHARDSON and WATKINS, Stohlman, and another individual, stating that they seemed to be making progress toward their future goals, and that the next step was setting up accounts at offshore brokerage firms, which UC-2 understood that defendant RICHARDSON and the other individual with foreign connections would assist UC-2 to establish.

51.     On or about January 27, 2015, the CW attended a meeting in Atlanta with defendants RICARDO RICHARDSON and JOHN SCOTT WATKINS, Joel Stohlman, Person No. 1, an employee of a brokerage firm, the new CEO of FITX, and others. During a discussion among defendant WATKINS, Person No. 1, and the CW concerning ways to avoid required government forms for large cash deposits, the CW and Person No. 1 discussed casinos, Person No. 1 stated that he had a business account to which he was slowly adding cash, and defendant WATKINS stated that he believed that it best just to keep his cash in various private safes.

52.     As the meeting continued, the group discussed businesses and products that they were using or considering in connection with FITX and IGRW. Defendant RICARDO RICHARDSON introduced the CEO of FITX, who discussed an energy drink the company would be selling. Defendant JOHN SCOTT WATKINS stated that defendant EDWARD HEIL was working on the regulatory filing for IGRW. Defendant WATKINS noted that he had previously purchased debt from the CW. Defendant WATKINS and Person No. 1 also expressed concern, among other things, that an officer of IGRW needed to be replaced.

53.     During the meeting, the businesses and potential businesses for AIDC, FITX, and IGRW were discussed. Defendant RICARDO RICHARDSON explained that AIDC shares were "really tight," meaning that the schemers controlled the vast majority of free trading

AIDC shares. Joel Stohlman explained that there were 42 million free trading shares of AIDC that were in the hands of the schemers, defendant GARY WOLFF would be holding the stock certificates for the scheme participants, and the schemers controlled the shares of the company, meaning that they could control of who was selling shares and how proceeds were to be divided.

54.     The meeting participants discussed FITX buying CBD oil from IGRW. Defendant JOHN SCOTT WATKINS said that he was concerned that if they promoted a tonic that they had discussed promoting, message boards and chat rooms would start digging up information. He stated: "If they get into the tonic, what are they going to find out, that it hasn't been sold in six months, that there's no packaging for it? What I'm trying to avoid, and I guess I need the verbiage of the press release, is that they don't find a product that doesn't exist." Defendant WATKINS opined that the way that the press release is worded needs to be very particular, and focus more on the negative side of this than the positive, in order to satisfy critics on the message boards so that the rest of the people will go along with it.

55.     During the meeting, the group posed for a photograph, and defendant JOHN SCOTT WATKINS joked about the photograph being sent to the FBI.

56.     On or about February 10 and 11, 2015, defendant JOHN SCOTT WATKINS and the individual who was both the CEO of IGRW and the accountant for IGRW, FITX, and AIDC exchanged emails regarding the conversion of defendant WATKINS's debt in IGRW into IGRW shares. Defendant RICARDO RICHARDSON and Joel Stohlman were copied on some of these emails.

57.     On or about March 31, 2015, during a recorded call with UC-2, Joel Stohlman explained that defendant RICARDO RICHARDSON, Person No. 1, and Stohlman were consultants for IGRW and FITX and they would bring in defendant JOHN SCOTT

WATKINS as a consultant as well.

58.     During in and about April 2015, defendants RICARDO RICHARDSON and EDWARD HEIL, Person No. 1, and Joel Stohlman participated at various times in meetings and telephone calls with one another and UC-2 and other individuals to discuss AIDC, FITX, and IGRW.

59.     On or about April 28, 2015, during a recorded call, Joel Stohlman told UC-2 that defendant RICARDO RICHARDSON and Stohlman were talking to an individual in the Bahamas about setting up brokerage accounts for the deals.  Stohlman said that UC-2 should meet defendant EDWARD HEIL.  Stohlman explained that defendants HEIL and GARY WOLFF were partners who worked with Stohlman's group on every deal, and defendants HEIL and WOLFF supplied the public corporations that they were using for AIDC, FITX, and IGRW. Stohlman added that defendant HEIL also prepared the companies' SEC filings.

60.     During this conversation, Joel Stohlman told UC-2 that (i) all 80 million shares of AIDC, 40 million of which were free trading and 40 million of which were restricted shares, were controlled by the group; (ii) for IGRW, there were a billion shares divided between the CW and their group; and (iii) for FITX, the group had fewer free trading shares but had $998,000 in debt that could be converted into free trading shares.  Stohlman told UC-2 that he needed to talk to defendant EDWARD HEIL about the details.

## IV.     Mid-2015 Preparation

61.     On or about May 19, 2015, during a recorded conversation among UC-2, defendant RICARDO RICHARDSON, and Joel Stohlman, UC-2 explained, in response to a question from Stohlman, that if Stohlman sold $1 million of stock to UC-2's brokers, Stohlman's group would have to make a low offer to make sure that UC-2's brokers bought the group's

stock as planned because otherwise UC-2 would be buying someone else's stock. UC-2 also said that they would need to coordinate trading to ensure that UC-2 was purchasing the group's shares, but noted that since the group controlled all the free trading shares, this should not be much of a problem. Defendant RICHARDSON and Stohlman stated that they each had approximately $350,000 in convertible debt in AIDC. They agreed that UC-2 would get paid partially in cash pursuant to a consulting agreement and partially with stock from debt conversion. Defendant RICHARDSON explained that UC-2 would be setting up Costa Rican brokerage accounts in the names of UC-2's Bahamian IBCs, and the proceeds of sales from those accounts would go to bank accounts in the Bahamas in names of those same Bahamian IBCs.

62.     During this conversation, defendant RICARDO RICHARDSON noted that the payment could not be related to the sale of the stock, meaning that, although UC-2 was being paid to cause his brokers to buy the stock that the schemers were selling, the paperwork could not reflect this fact as such payments were illegal. Defendant RICHARDSON, Joel Stohlman, and UC-2 also discussed being careful to keep the amount of stock conversion in any one nominee account below thresholds set forth in SEC rules. In addition, defendant RICHARDSON mentioned that the new CEO of FITX had connections with a California pension fund that would buy and hold stock in a manner similar to the arrangement that UC-2 had with brokers who were willing to buy and hold stock.

63.     On or about May 26, 2015, during a recorded call with UC-2 and Joel Stohlman, defendant RICARDO RICHARDSON discussed the FITX's energy drink product and explained that the California pension fund was not purchasing stock, but rather debt that could be converted to stock. According to defendant RICHARDSON, their stock did not look good to hold, meaning they did not want to keep their shares in the company, and they needed to get it

trading. During the conversation, UC-2 stated that he would provide defendant RICHARDSON, Stohlman, and their group liquidity in the market if they paid UC-2 a fee of 40% of the purchase price, and if UC-2's brokers did not buy and put the stock away, the group would not have to pay the fee. UC-2 compared his services to other promoters who tried and sometimes failed to increase liquidity. UC-2 concluded: "You [unintelligible] sell $1 million worth of stock, I will make sure you sell $1 million worth of stock." Stohlman responded: "Right."

64.     As the conversation continued, UC-2 told defendant RICARDO RICHARDSON that UC-2 would be interested in defendant RICHARDSON's California pension fund contact because, if the pension fund bought some of the stock, it would provide cover for UC-2's brokers. Defendant RICHARDSON agreed.

65.     During this call among defendant RICARDO RICHARDSON, Joel Stohlman, and UC-2, Stohlman asked UC-2: "do your brokers, they buy, and hopefully the stock appreciates, they hold, or what do they . . . ?" UC-2 responded that the brokers bought stock and did not sell it unless UC-2 told them to do so, and that Stohlman's group would be paying 40 points (i.e., 40% of the purchase price) for UC-2's services to put away the stock for good. According to UC-2, the benefit to Stohlman's group was that UC-2's brokers have discretionary accounts, the brokers buy the stock, there are no red flags as nobody even knows it is in the account, and the stock would remain in those accounts for many years to come so there was no downward pressure on the market.

66.     During the same conversation, Joel Stohlman confirmed that they were going to open five IBCs and then open up offshore brokerage accounts, using a nominee. Stohlman also confirmed that the IBCs would buy debt that would be converted into shares, the shares would be held in those accounts, and the amount held in the accounts would equate to

40% of whatever volume was created for the deals for AIDC, FITX and IGRW.

67.     On or about June 2, 2015, defendant JOHN SCOTT WATKINS sent two emails to Joel Stohlman, attaching documents from Brokerage Firm A, which were needed to open an account.

68.     On or about June 4, 2015, during a recorded call, Joel Stohlman asked UC-2 to send defendant GARY WOLFF the tracking number for a stock certificate that UC-2 had previously sent to defendant WOLFF because defendant WOLFF was unable to find it. Stohlman also told UC-2 that Stohlman would check with defendant RICARDO RICHARDSON on the status of the foreign accounts that UC-2 was attempting to establish.

69.     On or about June 30, 2015, during a recorded call with UC-2, Joel Stohlman told UC-2 that Stohlman had asked IGRW to convert debt for himself, defendants RICARDO RICHARDSON and JOHN SCOTT WATKINS, and Person No. 1 into 750 million IGRW shares, and the company had agreed.  Stohlman noted that, at $.01 per share, this stock was worth $7.5 million.  Stohlman then stated that he would send account applications for Brokerage Firm A to UC-2.   Later in the call, Stohlman conferenced in the CEO of IGRW, and the participants discussed the need to coordinate the issuance of IGRW's press releases with UC-2's buying.

70.     On or about July 1, 2015, defendant JOHN SCOTT WATKINS sent two emails to Joel Stohlman about opening an account at Brokerage Firm A.  In one of these emails, defendant WATKINS forwarded the account number for the account for defendant WATKINS's entity at Brokerage Firm A.

71.     On or about July 2, 2015, UC-2 spoke to defendant EDWARD HEIL on a recorded call.  UC-2 told defendant HEIL that Joel Stohlman said that defendant HEIL could

update UC-2 about plans for AIDC. Defendant HEIL then told UC-2 that: (a) AIDC would soon merge with a restaurant in Atlanta; (b) after the merger, Brokerage Firm A would promote the stock to its customers; and (c) another individual would provide an investor relations campaign.

72.     During this same conversation, UC-2 told defendant EDWARD HEIL that UC-2 had brokers all across the country who would buy and hold the stock in exchange for 40% to 60% of the amount of stock purchased. During the conversation, defendant HEIL told UC-2 that his group did not care if UC-2 made money as long as his group made money. He also told UC-2 that the group had millions of shares of IGRW sitting in defendant GARY WOLFF's desk, and it would be great if UC-2 could help with that stock as well.

73.     On or about July 6, 2015, defendant EDWARD HEIL sent UC-2 an email enclosing a draft of an SEC Form 8-K for AIDC. The draft 8-K states that on a date left blank, the company had completed a share exchange agreement under which it acquired all outstanding shares of Diaspora Foods International L.L.C. and Asante Restaurant LLC in exchange for 35,330,000 shares of AIDC's common stock and one million shares of newly issued preferred stock, and that the common shares used by the company had been returned by existing shareholders for this purpose.

74.     On or about July 8, 2015, Joel Stohlman sent UC-2 an unsigned agreement providing for the transfer of 2,760,000 AIDC shares from Cap One LLC to FDQ, Inc. Cap One was one of the two offshore nominee entities that defendant RICARDO RICHARDSON and others helped the CW create in Summer 2014. FDQ was the entity into which the schemers were transferring their stock in order (i) to control the respective schemers' selling and (ii) to avoid scrutiny from the SEC. The draft agreement falsely stated that the transfer of AIDC shares would be made in satisfaction of a portion of debt that Cap One purportedly owed to FDQ. This

statement was false because Cap One did not owe any debt to FDQ.

75.     In the July 8, 2015 email, Joel Stohlman instructed UC-2 to sign but not date the agreement.  Stohlman explained that everyone's stock would be put in the FDQ account, and after the stock was sold from this account, the sale proceeds would be distributed into the schemers' brokerage accounts.  In addition, Stohlman stated that FDQ would eventually be acquired by AIDC so there would be no taxable event for FDQ.  On or about July 30, 2015, UC-2 returned the undated document, which had been signed by UC-1, acting as the nominee for UC-2, to Stohlman.  Creating signed, undated documents for the sale of the stock enabled the schemers to maintain control of the time that each schemer's stock was placed in FDQ.  This would prevent too much stock being sold at once, as selling the stock too quickly would cause the price of the stock to fall.

76.     On or about July 10, 2015, defendant JOHN SCOTT WATKINS sent Joel Stohlman an email regarding his IGRW shares, with two attachments.  Defendant WATKINS noted that he had received some of his IGRW shares, but stated that he had not received a share certificate for others.

77.     On or about July 13, 2015, Joel Stohlman, in a recorded call, told UC-2 that the group's shares would be pooled in FDQ and then sold to the brokers at Brokerage Firm A.  Stohlman explained that the group would hide the fact that they collectively owned more than 5% of AIDC stock by depositing less than 5% of AIDC's shares to Brokerage Firm A at a time.  Stohlman said that UC-2's portion of the proceeds from the sale of AIDC stock could be wired from FDQ's account to wherever UC-2 chose, and that loan documents could be prepared so that the event would not be taxable.  Any loan documents between FDQ and any of UC-2's entities would be false, as there were no loans.

78.     As the conversation continued, Joel Stohlman told UC-2 that Cap One's approximately 2.7 million AIDC shares, which belonged to the CW, would be separate from UC-2's 40% fee.  UC-2 told Stohlman that UC-2 planned to use one of UC-2's five offshore companies in the Bahamas so that the funds were not transferred to an account in the United States.

79.     On or about August 6, 2015, defendant RICARDO RICHARDSON, Joel Stohlman, and UC-2 spoke on a recorded call.  Stohlman explained that he and defendant RICHARDSON each had 250 million shares of IGRW, and defendant JOHN SCOTT WATKINS and Person No. 1 each owned 150 million shares.  According to Stohlman, IGRW had a real product and was a real company.  Stohlman said that he told the company to put out news, and the CEO of IGRW would be putting out press releases.  In response to a question from UC-2, Stohlman said that they were seeking price appreciation and getting money to the company.  He also stated that defendants GARY WOLFF and EDWARD HEIL were moving the group's shares of AIDC, held at Brokerage Firm A, to FDQ's account.

V.     **Implementation in Late 2015**

80.     On or about September 4, 2015, Joel Stohlman and UC-2 spoke on a recorded call.  Stohlman told UC-2 that they were finishing preparations for AIDC.  Stohlman stated that the group owned all AIDC shares, which they would be selling, and FDQ, the entity holding the shares, would fund the restaurant owned by AIDC.  According to Stohlman, the group, consisting of himself, defendants RICARDO RICHARDSON and JOHN SCOTT WATKINS, and Person No. 1, collectively owned 800 million shares of IGRW, but the stock was essentially worthless.  Stohlman stated that their group was not greedy and would be willing to pay a large fee for promotional services.  Stohlman confirmed that they were seeking to

27

generate $15 million in sales proceeds so that they could retain $9 million, and the rest would be used to pay UC-2's fee.

81.    On or about October 31, 2015, during a recorded call, the CW introduced UC-2 to Promoter A, with whom the CW had worked in the past. Promoter A explained that he emails newsletters to promote public companies, his prior deals with the CW (which included a prior manipulation of FITX) had done really well, and sub-penny stocks were more receptive to newsletter promotions.

82.    On or about November 13, 2015, during a recorded call, Joel Stohlman expressed his concern that IGRW's stock price was down to $.0005, and that he did not know about stocks and how to get the price to go up. UC-2 said that they should "prime the pump" and offered to introduce Stohlman to a stock promoter who did email blasts. Stohlman agreed with UC-2's statement that they wanted to get the company money and help it grow, but the group also wanted to make money. Stohlman said that he wanted to sell IGRW at $.002 a share, for a total of $1.6 million, or at $.004 a share, and AIDC for approximately $1.00 a share. Stohlman also agreed that he wanted to do email blasts. In response to a question from Stohlman regarding how the customers of the brokers dealing with UC-2 would get out of the stock that the brokers purchased for them, UC-2 responded that the brokers would not sell the stock because, if they did, the price would go down and UC-2 would not pay them.

83.    On or about the same day, November 13, 2015, defendant RICARDO RICHARDSON, Joel Stohlman, and UC-2 spoke on a recorded call. Stohlman asked UC-2 if he had heard of Promoter B, who helped stocks start trading, and asked if UC-2 was willing to work with him. Stohlman said that Promoter B would start, after which UC-2 would take over. According to Stohlman, Promoter B, who was defendant GARY WOLFF's and defendant

EDWARD HEIL's "guy," had one million shares of AIDC that he would use to "get going," and that Stohlman would text Promoter B's number to UC-2.

84.    On or about November 16, 2015, during a recorded call, defendant EDWARD HEIL told UC-2 that defendant HEIL wanted to discuss using UC-2's services for a different public company and wanted to put UC-2 in touch with Promoter B and another individual to get things going for that company. Defendant HEIL told UC-2 to tell one of the individuals that what they were doing was not illegal. After UC-2 responded that of course it was illegal to pay brokers to buy stock, and that everyone needed to be on the same page, defendant HEIL agreed and told UC-2 that the individual had been around for a while and was discreet, so UC-2 did not need to worry about that individual saying anything to anyone.

85.    On or about November 23, 2015, the schemers caused a Form 10-Q for AIDC to be filed with the SEC. This filing stated that the company's business had changed to a restaurant and food product business on August 31, 2015. The filing disclosed that, as of September 30, 2015, AIDC's current assets were $28,722, and its current liabilities were $183,257, resulting in a working capital deficit of $154,525. Although the filing stated that there were only two directors, which could cause less oversight over the CEO of the company, the filing did not disclose that the fraudsters, who were disguising the amount of their ownership and control by using nominees and foreign businesses, planned on exerting control over future press releases and the timing and value of stock sales.

86.    On or about November 24, 2015, UC-2 met with defendants GARY WOLFF and EDWARD HEIL during a recorded meeting at defendant WOLFF's office in New York. During the meeting, defendants WOLFF and HEIL discussed using UC-2's services. UC-2 explained that he could cause brokers to buy and hold stock for a period of a year or longer in

29

discretionary accounts. UC-2 said that he charged 40% of the purchase price, 30% of which would go to the brokers and 10% of which UC-2 would keep. UC-2 further explained that the brokers used discretionary accounts to conduct trades for high net worth individuals who would not be looking at their statements. The group also discussed how the payments to UC-2 could be said to be unconnected to the trading activity and how they could falsely book the payments to UC-2 so that they could be written off—to avoid paying taxes.

87.     During the meeting, defendant GARY WOLFF said that he did not want any problems with the SEC, as he had previously been suspended by the SEC, based on his failure to complete legal education courses required by the New York bar. Defendant WOLFF stated that he did not want to wire UC-2's fee to UC-2 directly so he would need to work through another individual, and he also did not want to pay taxes on the 40 points (i.e., 40%) that they were paying UC-2. In response, UC-2 said that nobody could know about the 40 points, again explaining to defendants EDWARD HEIL and WOLFF that UC-2 got 10% and the brokers got 30%. Defendant HEIL said that they needed to structure something as an expense and do it offshore.

88.     As the meeting continued, defendant GARY WOLFF said that he and defendant EDWARD HEIL each owned 6.5 million shares of AIDC. Defendant HEIL added that defendant RICARDO RICHARDSON and Joel Stohlman owned the same amount of stock as defendants HEIL and WOLFF did, and that others in the group had less. Defendant WOLFF also said that although he did use email, he did not want to communicate through email with UC-2 because he did not want it to look like he was sending UC-2 a bunch of stuff. Defendant WOLFF noted, however, that he and defendant HEIL or Stohlman should be able to get UC-2 a shareholder list for each company.

89.     On or about December 4, 2015, UC-2 sent an email to defendants GARY
WOLFF and EDWARD HEIL requesting DTC lists, an outline of future press releases, and other
relevant information for AIDC, IGRW, FITX, and other future deals.  Defendant HEIL
responded affirmatively by email the same day, copying defendant WOLFF and providing
details.  UC-2 replied to defendants HEIL and WOLFF requesting a listing of "all friendly
shares," including account name, brokerage house, and quantity of shares.  Defendant HEIL
agreed to provide this information in an email sent the same day to UC-2 and defendant WOLFF.

90.     On or about December 17, 2015, defendant RICARDO RICHARDSON
and Joel Stohlman spoke with UC-2 on a recorded telephone call.  Stohlman indicated that he
wanted to make sure that UC-2 was ready to proceed with the manipulation of AIDC and
possibly two other public companies in 2016.  After UC-2 affirmed that he was ready, Stohlman
stated that the group had twenty press releases for AIDC ready to go.  UC-2 shared that he had
been working with defendants GARY WOLFF and EDWARD HEIL to set everything up, but he
was still waiting for DTCs, shareholder lists, and an outline of press releases.

91.     On or about December 18, 2015, during a recorded call, Joel Stohlman
told UC-2 that Stohlman hoped that they could get something going with AIDC soon.  Stohlman
noted that UC-2 had quite a few shares of AIDC, whether UC-2 knew it or not.  When UC-2
asked how many AIDC shares he had, Stohlman responded that UC-2 had 2.76 million shares,
plus additional debt on the books to get an additional 3.3 million shares.  Following up, UC-2
asked, "I have debt that can be converted to 3.3 million shares?"  Stohlman responded, "Yes, it's
been paid for, uh, two and a half years ago."  UC-2 then asked, "I gave it to you two and a half
years ago?" and Stohlman responded, "Yes.  Well not specifically you, but yes."  After Stohlman
and UC-2 both laughed, UC-2 asked Stohlman the amount of the debt.  Stohlman replied that it

was $6,000 paid in August 2013. UC-2 asked whether the debt is allocated to him, and Stohlman responded, "it's allocated to you know who." UC-2 then stated, "basically to me . . . our big friend" (referring to the CW), and Stohlman confirmed that UC-2's conclusion was correct.

92.     During this same conversation, Joel Stohlman told UC-2 that there were 42 million free trading shares in AIDC, and a total of 88 million shares were issued and outstanding. According to Stohlman, the only parties who had deposited shares so far were Stohlman (4 million), defendant RICARDO RICHARDSON (4 million), FDQ (4 million), defendant EDWARD HEIL (6 million), defendant GARY WOLFF (6 million), and Promoter B (1 million). Stohlman stated that anyone else with shares, like defendant JOHN SCOTT WATKINS (3 million) and Person No. 1 (3 million), would be putting them into the FDQ account so that they would not be able to dump their shares on their own, i.e., sell them quickly during the manipulation in an uncontrolled manner. Stohlman confirmed to UC-2 that the shares were all under the schemers' control.

93.     As the same conversation continued, Joel Stohlman explained that Promoter B would get things started, and offered to assist UC-2 in opening a trust account through their stockbroker, as Stohlman and the others in his group could run anything they wanted through that broker's firm, because they had sold $30 million in stock through the broker previously. In response to UC-2's comment: "When the fox is running the chicken coop, that is a good thing," Stohlman said: "Exactly."

94.     During the same conversation, UC-2 stated that he could break up stock ownership into multiple accounts. Joel Stohlman responded: "That was one of the big reasons why you only got 2.7 million [shares]. Because you can't convert all of the $6,000 worth, which is 6 million shares, which would be greater than 5%. So that's why—you have to take them and

32

sell those first. Then convert the other debt to the shares and put them in. So you had to do it in two stages." UC-2 replied that he liked this plan, as he did not want too many filings with the SEC.

95.     During this conversation, Joel Stohlman also confirmed that UC-2 could speak freely with the stockbroker and said that he would give UC-2 the broker's cell phone number because the broker's other line was monitored. Stohlman agreed with UC-2's comment, "Yeah, I definitely don't want to have any of those conversations on that line. So definitely the cell phone will be good." Further, Stohlman confirmed that IGRW and FITX were still in play.

96.     As the conversation continued, Joel Stohlman said that they had 17 to 20 press releases ready for AIDC, and AIDC was the first of the three deals that they wanted done. He added that there were no DTCs for IGRW and FITX, but agreed to get the shareholder lists to defendant EDWARD HEIL, who would then meet with UC-2.

97.     On December 24, 2015, UC-2 sent holiday greetings to multiple individuals involved in the planned stock manipulation, including defendants RICARDO RICHARDSON, JOHN SCOTT WATKINS, GARY WOLFF, and EDWARD HEIL, as well as Joel Stohlman and six others, saying that UC-2 was looking forward to a "mutually beneficial" business relationship. Defendant WATKINS responded on December 25, 2015, wishing UC-2 a happy holiday and saying that he was looking forward to 2016.

## VI.    Discussions in January 2016

98.     On or about January 5, 2016, Person No. 1 sent an email to defendant EDWARD HEIL, copying defendant RICARDO RICHARDSON and Joel Stohlman, with the subject line "AIDC press releases." This email attached seven press releases about the Atlanta restaurant, the private company that had been merged into AIDC. In the email, Person No. 1

said that the attachments were the first seven press releases for "review and finalization." Person No. 1 stated that they were "good to go" from the company side, although the "[d]ates will need to be updated to meet release schedule/goals." Person No. 1 also told the email recipients that he had placed the press releases in the order that he thought they should be released. In addition, he addressed defendant RICHARDSON specifically, telling him that they needed to begin working on the next batch of releases.

99.    On or about January 6, 2016, during a recorded phone call, Joel Stohlman told UC-2 that Stohlman had talked to defendants GARY WOLFF and EDWARD HEIL, who said that they had no issues with paying UC-2 40% of the buying that he promised to arrange. Stohlman asserted that he just wanted to figure out how to do pay UC-2 "so it's legal." UC-2 suggested that they could conceal the payment of his fee with a consulting invoice, and Stohlman agreed that was a good idea. UC-2 said that he would be meeting with defendants WOLFF and HEIL, and that Promoter B would start doing some work on AIDC. UC-2 added that they needed to figure out the logistics of the planned trading and then do a few small trades to make sure the plans worked well.

100.    On or about January 11, 2016, during a recorded meeting at defendant GARY WOLFF's office in New York, defendant WOLFF and defendant EDWARD HEIL continued to discuss AIDC, FITX, IGRW, and another public company with UC-2. Defendant HEIL explained that for FITX and IGRW, Joel Stohlman and his associates controlled 500 million shares, and defendants HEIL and WOLFF controlled 50 million shares.

101.    During this same conversation, defendant GARY WOLFF stated that he and defendant EDWARD HEIL each owned 6.5 million shares of AIDC. Defendant WOLFF added that his shares were held in his and his son's names, and defendant HEIL's AIDC shares

were held in the name of two of defendant HEIL's corporations.

102. Defendant EDWARD HEIL said that the shares that he, defendant GARY WOLFF, defendant RICARDO RICHARDSON, and Joel Stohlman owned were deposited at the same brokerage firm. Defendant HEIL noted that when they sold these shares, their broker would divide the proceeds among the accounts. In response to a question from UC-2 concerning who was in Stohlman's group, defendant HEIL named defendant RICHARDSON, Stohlman, and Person No. 1. When asked about defendant JOHN SCOTT WATKINS, defendant HEIL said that he would need to check.

103. Defendant EDWARD HEIL also stated that the group had drafted seven or eight press releases, and AIDC's CEO would issue the press releases as needed. Defendant GARY WOLFF stated that he would email the shareholder list for AIDC to UC-2, and defendant HEIL said that he would send the draft press releases to UC-2.

104. As the conversation continued, they discussed the fact that AIDC had just started trading and that Joel Stohlman had used the entity FDQ for the trades. UC-2 mentioned utilizing Promoter A's email newsletter to get things started. Defendant GARY WOLFF noted that the stock would trade up after the press releases were distributed.

105. The discussion then turned to FITX and IGRW. Defendant GARY WOLFF stated that he and defendant EDWARD HEIL each owned 25 million shares of FITX, and defendants RICARDO RICHARDSON and JOHN SCOTT WATKINS, as well as Person No. 1 and Stohlman, each owned 125 million shares of this company. Defendant WOLFF added that for IGRW, he and defendant HEIL each owned 25 million shares. After discussing their shares in another public company, defendant WOLFF explained that for IGRW, defendant HEIL's 25 million shares were held in the name of a company and defendant WOLFF's 25

million shares were held in his name.  Defendant WOLFF said that for FITX, his 25 million shares were held in his name, and 12.5 million of defendant HEIL's shares were held in defendant HEIL's name and the other 12.5 million shares were held by defendant HEIL's company.

106.   Next, the discussion shifted to their plans for the manipulations. Defendant GARY WOLFF said that ideally, if Stohlman and his group could increase IGRW and FITX to $.01 per share, they could each sell for about a quarter of a million dollars.  Defendant EDWARD HEIL agreed, but indicated that perhaps they could do even better.  When UC-2 asked what their target was for AIDC, defendant HEIL initially deferred to UC-2.  Then UC-2 explained that he was going to use a guy with email blasts to promote AIDC, and this would hopefully increase its stock price.  UC-2 added that his brokers just placed the buy orders and the traders were not involved so he had limited control over the price.  Defendant WOLFF responded that they could probably just get more stock if needed.  Defendant HEIL stated that their ideal price for AIDC was $.20 to $.30 per share, and $.01 per share for FITX and IGRW.

107.   Later in the meeting, defendants GARY WOLFF and EDWARD HEIL, along with UC-2, discussed UC-2's kickback fee and brainstormed ways to pay this fee to UC-2 so that the payment could not be traced to them.  Defendant HEIL stated that the companies would set up the capital structure in any way that defendants WOLFF and HEIL asked. Defendant WOLFF added that if UC-2 wanted to start on the ground floor of these companies, UC-2 could be listed as a shareholder.  Defendant HEIL stated that they normally set up their associates as an accrued debt in the company's books, and later this debt was converted to shares.  Defendant HEIL explained that as a result, the accrued debt is audited and then there is never any question about whether it was set up after the fact.  When UC-2 questioned whether he

would be receiving convertible debt, defendant WOLFF responded that the companies did whatever defendants WOLFF and HEIL wanted. Defendant HEIL added that they knew and worked with the auditors so no one could ever come back and claim that the debt was backdated.

108.     As the conversation continued, defendant EDWARD HEIL suggested that for the wire payments that they would be sending to UC-2, they could use invoices to conceal the nature of the payments. UC-2 told defendants GARY WOLFF and HEIL that they would need to tell him what to put on the invoice. Defendant HEIL agreed. Defendant WOLFF agreed as well, and gave an example of a previous occasion when a company being questioned by the IRS gave the IRS supporting documentation and there were had no further problems.

109.     On or about that same day, January 11, 2016, defendant GARY WOLFF received an email from the transfer agent for AIDC attaching a shareholder list for the company. On or about January 12, 2016, defendant WOLFF forwarded this list to UC-2, copying defendant EDWARD HEIL, despite the fact that none of these individuals were corporate officers or directors, and therefore should not have had access to this information. UC-2 thanked defendant WOLFF and stated that they had a lot to do this year, and defendant WOLFF replied that he was looking forward to getting started.

110.     On or about January 13, 2016, defendant GARY WOLFF spoke with UC-2 on a recorded telephone call. In response to defendant WOLFF's inquiry, UC-2 stated that he was in Philadelphia, Pennsylvania, meeting with stockbrokers to arrange their participation in the group's planned stock manipulations. UC-2 claimed that they were excited about the deals. UC-2 and defendant WOLFF then discussed how the group would provide UC-2 with press releases in advance of the promotional campaign. UC-2 said that he already had the AIDC press releases and asked who would be sending the others. Defendant WOLFF said that Stohlman would send

the press releases for FITX and IGRW. Next, defendant WOLFF stated that they were able to account for all the shares of AIDC and then proceeded to describe how they were split among defendant WOLFF, defendant EDWARD HEIL, Stohlman's group, and Promoter B. UC-2 then suggested that perhaps half of his 40% fee for his buying program could be paid through stock transferred to his offshore company.

111.    In another recorded call, on or about January 13, 2016, UC-2 spoke to defendant EDWARD HEIL, who asked UC-2 whether UC-2's trading would occur in the near future and whether there would be a decent amount of volume. UC-2 explained that he would cause his brokers to buy approximately $4.9 million in AIDC, FITX, and IGRW stock from defendants HEIL and GARY WOLFF. UC-2 added that defendants HEIL and WOLFF would then receive the net of $4.9 million less his 40% fee, 30% of which would go to the brokers and 10% would go to UC-2. According to UC-2, this meant that UC-2 would get $1.96 million, which UC-2 said was needed to pay UC-2 and the brokers who would be purchasing the stock.

112.    During this call, when UC-2 asked if defendants GARY WOLFF and EDWARD HEIL could facilitate this payment, defendant HEIL said that they could send it by wire transfer if UC-2 sent a bill. Defendant HEIL commented that 60% of a good number is better than 100% of nothing, and that they would figure out a way to pay the 40% fee. UC-2 agreed and pointed out that the stocks were not liquid and would crash and burn after the brokers were done with them, so it would be better to receive 60% of the sales proceeds than to make nothing.

113.    As the conversation continued, defendant EDWARD HEIL and UC-2 discussed a different future deal, and UC-2 explained that he would use a different group of brokers to keep them segregated. UC-2 said that if defendants HEIL and GARY WOLFF were

looking to liquidate their shares in that company for a total of $4.5 million, 40% of that amount would be $1.8 million, which would need to be paid to UC-2 and his brokers. Defendant HEIL acknowledged this and said that they would need to make sure that the paperwork was in order in case they were ever questioned.

114.    On or about January 14, 2016, defendant RICARDO RICHARDSON and Joel Stohlman participated in a lengthy recorded call with UC-2. During this call, UC-2 told defendant RICHARDSON and Stohlman that he was in Philadelphia, Pennsylvania, and would be meeting with the brokers who would be paying to buy AIDC, FITX, and IGRW stock to put into their customers' accounts. They discussed the brokerage accounts in the Bahamas being set up in nominee names for UC-2, and defendant RICHARDSON said that he would follow up with Bahamian Attorney A. UC-2 told defendant RICHARDSON that he did not care about the choice of the nominee director, and defendant RICHARDSON told UC-2 that UC-2 would have online access to the account.

115.    During the call, Joel Stohlman stated that they did not want to hurt shareholders of these companies, but they also wanted to get out of their stock. He added that they were willing to work with UC-2 in any way he wanted.

116.    As the call continued, the participants reviewed the facts pertinent to the three planned manipulations:

a.    Regarding AIDC, Joel Stohlman explained that: (i) there was a total of 42 million free trading shares, (ii) he and defendant RICARDO RICHARDSON each owned 4 million shares, (iii) defendants GARY WOLFF and EDWARD HEIL each owned 6.5 million shares, (iv) Promoter B owned 1 million shares, and (v) FDQ, the entity that the schemers had set up to pool shares and control selling, had 2.5 million shares. Stohlman stated

that everyone else's shares were waiting to be transferred to the FDQ account, but only 4 million

shares could be deposited into the FDQ account at any one time to stay below the 5% ownership

threshold.  Defendant RICHARDSON acknowledged that they technically controlled or

influenced the other certificates being cleared.  Stohlman clarified that overall, 18 million of the

42 million total AIDC shares would be transferred and then sold from the FDQ account.

    b.    Regarding FITX, Stohlman stated that FITX's float (i.e., the

number of free trading shares) was huge and its share price was low—$.003.  Stohlman said that

he and defendant RICHARDSON owned 250 million FITX shares combined, and defendants

WOLFF and HEIL each owned 25 million.

    c.    Regarding IGRW, Stohlman said that he and defendant

RICHARDSON each owned 250 million shares, defendant JOHN SCOTT WATKINS and

Person No. 1 each owned 150 million shares, and the CEO of IGRW had an additional 30 to 35

million shares that he would want to sell.

    d.    With respect to both FITX and IGRW, Stohlman explained that

even though their float was large, most of the shares over which the schemers had no control

could not be sold because many of the individuals holding those stock certificates were

Canadian, and Canadian residents could not deposit their stock certificates into U.S. brokerage

firms.

    117.    During this January 14, 2016 call, defendant RICARDO RICHARDSON,

Joel Stohlman, and UC-2 also discussed the share price at which the schemers wanted to sell

these shares:

    a.    Regarding AIDC, Stohlman stated that due to the need to pay UC-

2's 40% fee, they wanted to sell all of their AIDC shares for $.60 to $.80 per share.  Following

this, Stohlman laughed and said that "obviously [defendant EDWARD HEIL], [defendant RICHARDSON], myself, and [defendant GARY WOLFF] would like to get out of ours first, at the highest [price]." Defendant RICHARDSON added that the schemers were seeking $3 million to $5 million for the restaurant, and that defendant RICHARDSON, Stohlman, and defendants WOLFF and HEIL would all be happy with $2 million to $3 million each.

      b.    Regarding FITX, Stohlman said that they were looking to sell these shares for at least $.01 per share, but opined that he thought that FITX's share price could rise to $.05 to $.10.

      c.    Regarding IGRW, Stohlman expressed hope that its share price would increase to $.005 as a result of the manipulation, and defendant RICHARDSON suggested that IGRW's share price could rise to $.005 to $.01.

## VII.   Test Trades in Early February 2016

      118.   In or about early February 2016, the schemers took steps to prepare for the test trades that they planned to execute to ensure that their plan to have brokers purchase the schemers' stock on behalf of their unknowing clients would work.

      119.   On or about February 2, 2016, UC-2 informed Joel Stohlman and defendant EDWARD HEIL by text message that he was looking to do some test trades shortly involving the stock that they had been discussing (AIDC, FITX, IGRW, and another ticker).

      120.   On or about the following day, February 3, 2016, UC-2 sent an email to defendants GARY WOLFF and EDWARD HEIL regarding their planned scheme. The email asked whether defendants WOLFF and HEIL had any luck getting scheduled press releases for several companies, including FITX and IGRW. UC-2's email also stated that updated AIDC press releases would be useful. UC-2 noted that he was waiting for press releases and assurance

that companies would release them "when we tell them." UC-2's email specifically stated: "I want to get the info so that we can coordinate the email blast with the press releases for maximum pump." It concluded: "Also, may look to coordinate small trades later this week or first thing next week."

121.    On or about the same day, February 3, 2016, defendant EDWARD HEIL responded to UC-2's email, copying defendant GARY WOLFF. His response directed UC-2 "to call Joel [Stohlman] to emphasize the need for press releases on FITX and IGRW." Later in this same email chain, UC-2 stated that he wanted to do a $5,000 AIDC trade the next day to make sure that the group's mechanics were in place before they went big. UC-2 asked whether defendants HEIL or WOLFF were available the next day to coordinate the sale of their position. Soon afterwards, defendant HEIL responded, copying defendant WOLFF, and stated that one of them would be available to participate in the coordinated trade.

122.    On or about February 4, 2016, UC-2 had multiple recorded conversations with participants in the test trades in AIDC and FITX stock that they executed later that day. The plan was to have the schemers offer a prearranged amount of AIDC and FITX shares at a prearranged price and time, and to have UC-2's brokers purchase these shares at the prearranged price and time.

a.    During these conversations, Joel Stohlman said that he would coordinate the AIDC trade, in which defendant RICARDO RICHARDSON would sell AIDC stock to UC-2's brokers, and defendant EDWARD HEIL would coordinate the FITX trade, in which defendant GARY WOLFF would sell to UC-2's brokers, and that the groups' broker would distribute the proceeds.

b.    In a separate recorded call, defendant RICHARDSON informed

UC-2 that he had spoken to Stohlman. Defendant RICHARDSON reported that he had

submitted an order to sell 50,000 shares of AIDC at $0.10 per share.

c.     In a call with defendant WOLFF, UC-2 explained the purpose of

the test trades, and stated that they would start the promotion of AIDC, FITX, IGRW, and

another stock within the next few weeks. UC-2 said that he had been told that defendant

WOLFF would participate in the test trades for FITX and IGRW, which would involve selling

$5,000 worth of each stock. UC-2 stated that for FITX, the current offer was $0.004 per share

and his brokers would bid $0.0038 per share for 1.3 million shares. UC-2 told defendant

WOLFF to offer that, and UC-2 would bid that price and amount. UC-2 stated that defendant

WOLFF should offer 12.9 million shares of IGRW at $0.00039 per share. Defendant WOLFF

responded that he would call the group's stockbroker immediately to place the prearranged

offers. Defendant WOLFF also agreed that he would call or text UC-2 after defendant WOLFF

placed the sell order so that UC-2 would know when to make the bids.

123.    On or about February 4, 2016, as the schemers had directed and agreed,

the schemers sold (i) approximately 30,050 shares of AIDC stock for approximately $.098 per

share, for a total of approximately $2,945, and (ii) approximately 1,155,000 shares of FITX stock

for approximately $.0038 per share, for a total of approximately $4,389. In reality, and

unbeknownst to the defendants, the FBI purchased many of these shares with its undercover

funds. The co-schemers agreed to pay UC-2 and his brokers 40% of this total amount for buying

these AIDC and FITX shares in prearranged stock transactions.

124.    During a call with defendant EDWARD HEIL on February 4, 2016, UC-2

informed defendant HEIL that he did the AIDC test trade with Joel Stohlman and the FITX test

trade with defendant GARY WOLFF, but there was an issue with IGRW. Defendant HEIL

expressed his belief that the issue would be resolved by early the next week. After discussing

problems with IGRW, UC-2 asked whether its management would be able to issue press releases

reliably. Defendant HEIL assured UC-2 that they had a couple good press releases and would

wait to issue them until UC-2 told them to do so. UC-2 explained that he wanted to make sure

that the test trades were done and he could pay the brokers. UC-2 further explained that once

the fee for UC-2 and the brokers' payment was wired, UC-2 could start causing the brokers to

begin buying on a larger scale. UC-2 told defendant HEIL that AIDC, FITX, and IGRW would

issue press releases, and the next day he and his brokers would "hit it hard."

## VIII.   Kickback Payments and Additional Actions in Mid-February 2016

125.    On or about February 5, 2016, to pay the kickback fee for the test purchase

in FITX stock, the co-schemers caused approximately $2,000 to be wired from defendant GARY

WOLFF's bank account held at First Republic Bank to a BB&T account in UC-1's name in

Philadelphia, Pennsylvania. The co-schemers understood that these funds were the bribe

payment to UC-2 and his brokers for making the prearranged purchase of FITX stock on or about

February 4, 2016.

126.    In or about early February 2016, Person No. 1 had multiple email

exchanges with IGRW management regarding his dissatisfaction with the company's original

draft press release, but approved what he considered their improved version in an email, copying

defendant RICARDO RICHARDSON and Joel Stohlman.

127.    On or about February 10, 2016, in a series of recorded calls, Joel Stohlman

told UC-2 that the press releases were ready for AIDC, defendant RICARDO RICHARDSON

had the press releases for FITX, Person No. 1 had them prepared for IGRW, and the press

releases would be sent to UC-2. Stohlman also explained that for AIDC, he and RICHARDSON

each had 4 million shares, defendants HEIL and WOLFF each had 6.5 million shares, and FDQ, the group's company, also had shares.

128.   As the conversation continued, when UC-2 asked about the 40% payment due to him from the AIDC test trade, Joel Stohlman responded that it had just cleared, and after they received it, they would wire it to UC-2. Stohlman said that going forward, each person whose shares were purchased by UC-2's brokers would be responsible for making the 40% payment to UC-2. Stohlman stated that their stockbroker would sell the AIDC shares and then divide the proceeds among the following five parties on Stohlman's side: Stohlman, defendants RICARDO RICHARDSON, GARY WOLFF, and EDWARD HEIL, and FDQ.

129.   As the conversation continued, Joel Stohlman then explained that FDQ was "the funding source for the company, so anything that's sold in that, will, the company is going to use to fund their operations." He added that the person running FDQ was a close friend of defendant RICARDO RICHARDSON. When UC-2 asked how defendant JOHN SCOTT WATKINS and Person No. 1 were participating, Stohlman explained that their shares were going into FDQ as FDQ sold shares, and they would only be getting a small portion of FDQ's proceeds. Stohlman stated that most of the first round of sales from FDQ would fund the company, but then the other participants would sell their shares from FDQ. Stohlman noted that if the selling was not organized through FDQ, then fifteen people would be selling, and they would have no control over that. Stohlman also named several other individuals who would be contributing their AIDC shares to FDQ to be sold.

130.   On or about February 10, 2016, during a recorded call, UC-2 and defendant GARY WOLFF discussed AIDC, FITX, IGRW, and other future deals. On this call, defendant WOLFF explained that one reason that IGRW stock could not be sold was because the

45

company was not current on a $3,600 fee owed to the State of Nevada. UC-2 stated that he was planning to start his buying on Wednesday, referring to February 17, 2016. He noted that on Tuesday night, they would cause the three companies to issue press releases, and, on behalf of the schemers, he had hired someone to send out email blasts about the companies on Tuesday night to increase the price. Defendant WOLFF agreed with that plan.

131.    Also, on or about February 10, 2016, in a recorded call with defendant EDWARD HEIL, UC-2 discussed the recent test trades in AIDC and FITX. Defendant HEIL explained that the problem with IGRW was that it was not current with its filings and fees. UC-2 said that he had received the $2,000 from defendant GARY WOLFF on behalf of defendants WOLFF and HEIL, and defendant HEIL said that he would ask Joel Stohlman to send AIDC's kickback and resolve IGRW's issues. UC-2 stated that the plan was to issue press releases and email blasts for all three companies on Tuesday night, referring to February 16, 2016, and then start his buying the next day. UC-2 added that if IGRW did not get resolved, they might need to put everything off because he had already paid for the email blasts. Defendant HEIL agreed to press Stohlman.

132.    On or about February 11, 2016, UC-2 sent an email to defendants RICARDO RICHARDSON, GARY WOLFF, and EDWARD HEIL, and Joel Stohlman, asking whether IGRW would be trading by the following Wednesday, referring to February 17, 2016, as he needed to know because he had a promotion ready to go out the night before for AIDC, FITX, and IGRW. UC-2 also requested the press releases for all three companies, emphasizing that he needed the press releases in hand and also needed to know that they would be released the night of the promotion. The schemers sent multiple responses to this email in their effort to coordinate UC-2's prearranged buying with the press releases and the email blasts:

a.      Defendant RICHARDSON responded, copying Stohlman and Person No. 1, and said that he would send the releases to UC-2 by the next day.  Moments later, defendant RICHARDSON sent an email just to UC-2 reiterating that UC-2 would receive the press releases and stating that the group wanted to proceed on Tuesday (referring to February 16, 2016).  Defendant RICHARDSON also immediately forwarded UC-2's request to the CEO of AIDC, stating:  "FYI confidential… I need the press releases on the sauces ASAP.  Thanks today Chef.  Thanks."

b.      Defendant HEIL responded and copied everyone on the original email.  He stated that defendant WOLFF would be working with Stohlman to get IGRW current, and Stohlman would push his guys for the press releases.

c.      In reply to one of defendant RICHARDSON's emails, UC-2 asked whether the account for his IBC had been set up at the brokerage firm at which their stockbroker worked, and whether defendant RICHARDSON could set up a call with the Atlanta Accountant to discuss the "foundation tax play," referring to a fraudulent means of reducing tax liability through fake charitable contributions.  Defendant RICHARDSON forwarded this email to the Atlanta Accountant, stating:  "One of our investment guys wants to talk to you about taxes."

d.      Stohlman also participated in this email chain, replying to UC-2 and defendant RICHARDSON, copying Person No. 1. and stating that IGRW would not be ready in time so they should proceed with the two others for the time being.

133.    On or about February 12, 2016, the schemers continued to coordinate the issuance of the press releases for their planned stock manipulations.  Joel Stohlman and Person No. 1 exchanged emails concerning the restaurant that was the business associated with AIDC, and defendant RICARDO RICHARDSON forwarded press releases to Stohlman and Person No.

1 for the energy drink company that had merged with FITX. The next day, on or about February 13, 2016, Stohlman forwarded the press release to Person No. 1, asking him to review it, because Stohlman thought that "it need[ed] a lot of help." Person No. 1 responded to Stohlman and defendant RICHARDSON that day enclosing three updated FITX press releases.

134. On or about February 14, 2016, Person No. 1 sent defendant RICARDO RICHARDSON and Joel Stohlman another revised version of the FITX press release, and defendant RICHARDSON, copying Stohlman, approved the press releases. That same day, defendant RICHARDSON emailed Person No. 1, copying Stohlman, and instructed Person No. 1 to forward the press releases to the CEO of FITX, "and let him know he needs to clear these... I want to to [sic] come from you." After receiving this email, Person No. 1 sent an email to defendant RICHARDSON, Stohlman, and the CEO of FITX, attaching press releases and telling the CEO that Person No. 1 had broken the press releases into three separate releases for the most "bang." Person No. 1 asked the CEO to approve as attached or provide other updates.

135. On or about Tuesday, February 16, 2016, preparation of press for the stock manipulations continued. Defendant EDWARD HEIL sent an email to UC-2 and defendant GARY WOLFF forwarding ten press releases for AIDC. This email forwarded a chain of emails originating with an email from AIDC's CEO to Joel Stohlman, Person No. 1, and defendant RICARDO RICHARDSON. Defendant HEIL also forwarded an email from defendant RICHARDON to UC-2 and defendant WOLFF that included five press releases for FITX.

136. On or about February 16, 2016, in a recorded call, defendant RICARDO RICHARDSON told UC-2 that defendant RICHARDSON had spoken with the group's stockbroker, and informed him that the group had a buyer for their shares. Defendant RICHARDSON said that he had instructed the broker to try and sell all of the group's shares.

Defendant RICHARDSON told UC-2 that when UC-2 had an order, he should call defendant

RICHARDSON, who would call the nominee CEO of FDQ, the entity that was holding the

group's shares, and this nominee would then call the broker. In response to UC-2's question as

to whether UC-2 should call the broker to confirm these plans, defendant RICHARDSON first

replied that UC-2 could call the broker if the broker was on his cellphone and not on a recorded

line. Later in the call, however, when defendant RICHARDSON realized that UC-2 had not

known the broker long, defendant RICHARDSON said that UC-2 should wait to call the broker

until after they had done some matched trades, as the broker would then be willing to speak

freely with UC-2.

       137.    During this call, defendant RICARDO RICHARDSON stated that he and

UC-2 had a telephone call scheduled with the Atlanta Accountant later that day. Defendant

RICHARDSON explained that he had owed the IRS $900,000, and this accountant had reduced

this amount to $47,000 by creating fake charitable contributions. Defendant RICHARDSON and

UC-2 also discussed proceeding with the promotion of IGRW even though it was not ready to

trade because it would be ready soon.

       138.    Later that day, during a recorded call with UC-2 and the Atlanta

Accountant, defendant RICHARDSON told UC-2 that the only reason that this accountant was

willing to assist UC-2 in creating a fake charitable contribution was because UC-2 was "part of

the family." During the call, the Atlanta Accountant agreed to assist UC-2 with fraudulently

reducing UC-2's tax liability in exchange for a fee of 15% of the amount of the fake charitable

contributions.

       139.    On or about February 16, 2016, to pay the kickback fee for the test

purchase in AIDC stock, the co-schemers caused approximately $1,089.50 to be wired from

FDQ's Wells Fargo bank account to a BB&T account in UC-1's name in Philadelphia,

Pennsylvania. The co-schemers understood that these funds were the bribe payment to UC-2 and

his brokers for making the prearranged purchase of AIDC stock on or about February 4, 2016.

140.    On or about February 16, 2016, during a recorded call, UC-2 spoke with

defendants GARY WOLFF and EDWARD HEIL, who were seeking directions from UC-2 to

provide to the group's stockbroker. UC-2 responded that, although he was ready to proceed, he

had been waiting on the press releases to be issued and the wire transfer from defendant

RICARDO RICHARDSON and Joel Stohlman. UC-2 stated that because defendant

RICHARDSON had rectified the situation (the payment for the earlier coordinated trade had not

been timely delivered to UC-2), they could move forward on Thursday night, referring to

February 18, 2016. UC-2 explained that the stockbroker would need to see the purchase orders

that UC-2 was arranging and pair them up with the group's sales orders.

## IX.    Manipulative Activity on February 17 and 18, 2016 and Trading Suspension on February 19, 2016

141.    On or about Wednesday, February 17, 2016, defendant EDWARD HEIL

spoke with UC-2 on a recorded telephone call regarding the group's plans. UC-2 reiterated that

first, on Friday, referring to February 19, 2016, the press releases would be issued and then the

promotions would be sent out. Defendant HEIL asked what the stockbroker should look for to

get the planned trading going. UC-2 replied that the trades needed to be matched. UC-2 stated

that UC-2 would call defendant HEIL to let him know what amount and at what price to buy, and

then defendant HEIL would coordinate through the broker. Again, defendant HEIL agreed to

participate in this matched trading, along with defendant GARY WOLFF and Joel Stohlman.

Next, UC-2 stated that UC-2 needed the 40% fee quickly because of the need to pay the brokers

quickly. In response, defendant HEIL assured UC-2 that his group would wire the fee out

quickly and defendant WOLFF would help Stohlman with the mechanics of the payment. Finally, in response to UC-2's question regarding who would be putting out the AIDC press release, defendant HEIL assured UC-2 that everything would be coordinated, and that the press release would be issued by either Stohlman or defendant RICARDO RICHARDSON.

142.    On or about February 17, 2016, Joel Stohlman sent an email to Person No. 1 with the subject line "fyi whats owed . . . ." The email attached a chart reflecting three sets of FITX's purported liabilities:  accrued interest, accrued consulting, and various other debts. This chart, circulated the day before the schemers began the manipulation in earnest, showed, among others things, that according to FITX's books and records, (i) defendant RICARDO RICHARDSON, defendant JOHN SCOTT WATKINS, Person No. 1, Stohlman, and the CW were owed accrued interest; and (ii) defendant RICHARDSON, defendant WATKINS' entity, and Person No. 1, and Stohlman were owed accrued consulting fees.  Significantly, these debts could be converted into shares through debt conversion.  Upon receiving this information, Person No. 1 responded later the same day: "wow . . . . cool . . . . ."

143.    On or about February 18, 2016, defendant EDWARD HEIL sent an email addressed to two employees of a brokerage firm, which would be selling the schemers' shares during the manipulations.  Defendant HEIL blind copied defendant GARY WOLFF.  Defendant HEIL informed the brokerage firm employees that there was "likely to be activity in FITX and AIDC very soon."  He instructed them to sell as many of his FITX and AIDC shares as possible and advised them to "[b]e fair" to the "other shareholders with large holdings of these shares who ha[d] accounts with" the brokerage firm.  Defendant HEIL was referring to the arrangement that the schemers had previously discussed over the telephone with one of the brokerage firm

employees by which the broker would sell as many shares of the manipulated securities as he could and then allocate the proceeds equally among the scheme participants.

144.    Later, on or about February 18, 2016, defendant GARY WOLFF participated in a recorded call with UC-2 to discuss their plans to start the manipulation of AIDC and FITX.  During this telephone call, defendant WOLFF conferenced in the broker who would be selling the schemers' shares during the manipulation.  Defendant WOLFF informed the broker that AIDC and FITX would both be putting out a lot of press, which would lead to a lot of trading activity.  Defendant WOLFF added that he and defendant EDWARD HEIL would be calling the broker and asking him to sell at certain prices.  The broker replied that he had already spoken about this with defendant HEIL, who had sent an email (referring to defendant HEIL's email from earlier in the day).  The broker added that he had told defendant HEIL to stop sending emails.  Defendant WOLFF then commented that he was annoyed with the explicit nature of defendant HEIL's email (upon which he had been blind-copied), and that there was no reason to send this email.

145.    Immediately after this conference call with the stockbroker, defendant GARY WOLFF and UC-2 spoke again on a recorded telephone call.  When UC-2 asked what defendant EDWARD HEIL had said in the email to the broker, defendant WOLFF responded that he had "almost puked" when he heard it.  Defendant WOLFF explained that the email said that a bunch of them were selling stock, the broker should make sure to sell it proportionately from each account, and the broker should not sell to anyone else who is a stranger.  UC-2 agreed that one would not want this information recorded in an email.

146.    On or about February 18, 2016, at the direction of the co-schemers, a press release for AIDC entitled "Asante International Dining Corp. (AIDC) Announces Celebrity Chef as CEO" was issued.

147.    On or about February 18, 2016, at the direction of the co-schemers, a press release for FITX entitled "GIDDY UP Energy Products Launch Update" was issued.

148.    Later on or about February 18, 2016, in conjunction with the issuance of these press releases, the co-schemers, working with UC-2, caused misleading email blasts touting AIDC, FITX, and IGRW to be widely disseminated to potential investors. These email blasts were misleading because they did not disclose various material facts, including the fact that the co-schemers: (i) collectively controlled the vast majority of AIDC, FITX, and IGRW stock available for trading, (ii) were coordinating these public companies' press releases with email blasts and/or prearranged stock transactions, and (iii) were paying kickbacks to brokers to purchase their stock in their customers' discretionary accounts. The schemers promoted IGRW despite the fact that the company's regulatory problems had not yet been resolved because the schemers planned to solve them soon and manipulate IGRW in the near future.

149.    In the weeks and months following the SEC's suspension of trading in AIDC, FITX, and IGRW stock on February 19, 2016, the schemers took efforts to continue the scheme.

150.    On or about January 14, 2016, in the Eastern District of Pennsylvania and elsewhere, defendants

**RICARDO RICHARDSON,**
**JOHN SCOTT WATKINS,**
**GARY WOLFF, and**
**EDWARD HEIL**

for the purpose of executing the scheme described above, caused to be transmitted by means of wire communication in interstate and foreign commerce the signals and sounds described herein, that is, defendant RICHARDSON and Joel Stohlman, while they were not in Pennsylvania, participated in a telephone call with UC-2 (who was in Philadelphia, Pennsylvania) during which they planned the scheme described above.

All in violation of Title 18, United States Code, Section 1343.

## COUNT TWO

**THE GRAND JURY FURTHER CHARGES THAT:**

  1. Paragraphs 1 through 14 of Count One of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

  2. From in or about Spring 2014 through in or about Spring 2016, in the Eastern District of Pennsylvania, and elsewhere, defendants

**RICARDO RICHARDSON,**
**JOHN SCOTT WATKINS,**
**GARY WOLFF, and**
**EDWARD HEIL**

conspired and agreed, with Joel Stohlman and others known and unknown to the grand jury, to defraud the United States by impeding, impairing, obstructing, and defeating the lawful functions of the SEC in the regulation and monitoring of the purchase and sale of publicly traded securities.

### MANNER AND MEANS

  It was part of the conspiracy that:

  3. Paragraph 16 of Count One is incorporated here.

### OVERT ACTS

  In furtherance of the conspiracy and to accomplish its objects, defendants RICARDO RICHARDSON, JOHN SCOTT WATKINS, GARY WOLFF, and EDWARD HEIL, Joel Stohlman, and others known and unknown to the grand jury committed the following overt acts, among others, in the Eastern District of Pennsylvania and elsewhere:

  1. Paragraphs 17 through 149 of Count One are incorporated here.

  All in violation of Title 18, United States Code, Section 371.

## COUNTS THREE AND FOUR

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 14 and 16 through 149 of Count One of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.      From in or about Spring 2014 through in or about Spring 2016, in the Eastern District of Pennsylvania and elsewhere, defendants

**RICARDO RICHARDSON,
JOHN SCOTT WATKINS,
GARY WOLFF, and
EDWARD HEIL**

did unlawfully, willfully, and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b–5, by:  (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon any person, in connection with the purchases and sales of the securities described below, each class of securities constituting a separate count:

| COUNT | DESCRIPTION |
|-------|-------------|
| THREE | securities of AIDC |
| FOUR | securities of FITX |

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and

Title 17, Code of Federal Regulations, Section 240.10b–5, and Title 18, United States Code,

Section 2.

**A TRUE BILL:**

███████████████████

**FOREPERSON**

**WILLIAM M. McSWAIN**
**UNITED STATES ATTORNEY**

57

*Criminal No.*

# UNITED STATES DISTRICT COURT

Eastern District of Pennsylvania

Criminal Division

THE UNITED STATES OF AMERICA

Vs

RICARDO RICHARDSON, JOHN SCOTT WATKINS
GARY WOLFF AND EDWARD HEIL

INDICTMENT

Counts

18 U.S.C. § 1343 (wire fraud – 1 count)
18 U.S.C. § 371 (conspiracy – 1 count)
15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5 (securities fraud – 2 counts)
18 U.S.C. § 2 (aiding and abetting)

Foreman

Filed in open court this _____ day,

Of _____ A.D. 20 _____

_____
Clerk

_____

Bail, $ _____